IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

01 SEP 28 PM 12: 01

U.S. DISTRICT COURT
N.D. OF ALABAMA

ELEANOR POWERS, et al.              )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )        CIVIL ACTION NO. 99-JEO-1572-S
                                    )
CHILDREN'S COMPREHENSIVE            )
SERVICES, INC., d/b/a ALABAMA       )
CLINICAL SCHOOLS,                   )
                                    )
        Defendant.                  )

ENTERED

SEP 2 8 2001

**MEMORANDUM OPINION**

This matter is before the court on the defendant's motion for summary judgment filed on

August 15, 2000, (Doc. 19)[1] and the defendant's motion to strike, filed October 13, 2000, (Doc.

29).  Upon consideration of the record, the submissions of the parties and the relevant law, the

court finds that the motion to strike is due to be granted in part and denied in part, and the motion

for summary judgment is due to be granted.

I.      **PROCEDURAL BACKGROUND**

Plaintiffs Crystal Reynolds ("Reynolds") and Valerie Vie ("Vie") (together, the

"plaintiffs")[2] claim that Children's Comprehensive Services, Inc. ("CCS"), d/b/a Alabama

Clinical Schools ("ACS") discriminated against them in violation of Title VII of the Civil Rights

---

[1] References to "Doc. __" are to the documents as numbered by the clerk of court in the
court's record of the case.

[2] Eleanor Powers was originally a plaintiff in this lawsuit, but voluntarily dismissed her
claims on February 7, 2000.  (Doc. 18).

*37*

Act of 1964, as amended by the Civil Rights Act of 1991, U.S.C. § 2000e *et seq.* ("Title VII") and under 42 U.S.C. § 1981 ("§ 1981").  Reynolds also includes a claim for discrimination in compensation under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).

On December 2, 1998, Valerie Vie filed charges of sex discrimination and retaliation, and on May 8, 1999, filed an additional charge of race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), which issued her a right-to-sue letter. (Doc. 26 at Ex. 2).[3]

On January 27, 1999, Crystal Reynolds filed charges of sex discrimination and retaliation, and on May 8, 1999, filed an additional charge of race discrimination and retaliation, including constructive discharge, with the EEOC, which issued her a right-to-sue letter.[4]  (Doc. 26 at Ex. 1).  Vie and Reynolds then timely filed the present action on June 17, 1999.  (Doc. 1).

CCS filed the instant motion for summary judgment on August 15, 2000, arguing that Vie and Reynolds have failed to establish a prima facie case with respect to their discrimination and harassment claims, that Reynolds is unable to establish a claim for constructive discharge or a violation of the EPA, and that Vie is unable to establish a claim for retaliation.  (Doc. 19).  CCS further argues that summary judgment is due as to any claims based upon actions or events occurring on or before CCS's acquisition of ACS in September of 1998.  (Doc. 19).

In response to the motion for summary judgment, the plaintiffs argue that they have

---

[3]Document 26 is "Plaintiffs' Submission of Evidence in Support of its Brief in Opposition to Defendant's Motion for Summary Judgment."  Individual exhibits attached thereto will be referenced by number as "Ex. __".  Specific pages from depositions or exhibits thereto will be indicated following the individual exhibit numbers.

[4]Reynolds did not ultimately include a claim for retaliation in her complaint in this case. (Doc. 1 at 6-7).

established a prima facie case with respect to each claim of discrimination, constructive

discharge and retaliation. They argue that the defendant's motion for summary judgment is due

to be denied. (Doc. 27).

## II.     FACTUAL BACKGROUND

ACS is a private psychiatric residential center for male juvenile sex offenders. (Doc. 21,

Ex. 8 at 30). It opened in Birmingham in April of 1998, at which time it was owned and

operated by Ameris Corporation.[5] (*Id*. at 24, 29-31). Michael Townley, a licensed clinical social

worker, was employed by ACS at its inception as CEO and Administrator of Operations. (Doc.

26 at Ex. 1). Townley hired Eleanor Powers to work as Director of Clinical Operations in

March of 1998, during his initial staffing efforts for ACS. (Doc. 26, Ex. 7 at ¶ 1).

### A.     Valerie Vie

In June, 1998, Powers interviewed and hired Valerie Vie as a recreational counselor.

(Doc. 26, Ex. 6 at ¶ 1). Vie's duties and responsibilities included supervising and scheduling

recreational therapy groups, participation in committees and scheduled meetings, recommending

budgeting needs for maintaining equipment inventories and subsequent steps to order or

distribute equipment in furtherance of maintaining inventories, ensuring the completion of timely

initial patient assessments, providing appropriate recreational therapy interventions to all

patients, maintaining a safe environment in the areas where recreational therapy services are

provided, developing and maintaining unit-specific Resources Manuals, and updating policies

and manuals in accordance with regulatory standards. (Doc. 26 at Ex. 5). The physical demands

---

[5]As is stated above, CCS acquired ACS in September of 1998. (Doc. 21, Ex. 8 at 23-24,
41).

3

for her position required satisfactory health, stamina, and strength for frequent walking, standing, sitting, lifting, and assisting the restraint of patients, satisfactory vision and hearing, agility and coordination to participate in group activities and the willingness and ability to assist in protecting patients in emergency situations. (Doc. 26 at Ex. 5).

On December 2, 1998, Vie filed a charge of discrimination with the EEOC for sex discrimination and retaliation, alleging that Mike Townley harassed her on the basis of her sex and retaliated against her for reporting the harassing conduct to Human Resources Director John Lewis and Vice President Al Smith. (Doc. 26 at Ex. 2). Vie alleged that Townley discriminated against her by ignoring her, speaking to her in a rude and demeaning manner, criticizing her work, and denying her the supplies and tools she needed to perform her duties. (*Id.*). She also alleged that Townley retaliated against her by "increasing his harassment and efforts to sabotage [her] work performance by denying [her] supply requisitions." (*Id.*).

On January 15, 1999, Vie injured her back while playing basketball with some of the residents. (Doc. 26 at Ex. 5). Vie was under medical care and out of work for "a couple of weeks." (Doc. 21, Ex. 2 at 167).[6] Upon her return to work in February, she provided ACS with a note from her physician stating that she was to be under light-duty restrictions, minimizing her participation in physical activities and completely preventing her from physically restraining the residents in any way. (Doc. 21, Ex. 2 at DX 1).[7] In addition, the doctor's note advised that even

---

[6]Document 21 is "Defendant's Evidentiary Submissions in Support of its Motion for Summary Judgment." Individual exhibits attached thereto will be referenced by number as "Ex. __." Specific pages from depositions or exhibits thereto will be indicated following the individual exhibit numbers.

[7]"DX 1" refers to Defendant's Exhibit 1 of the cited document.

after Vie achieved maximum medical improvement, she would be permanently restricted from physically restraining the residents. (*Id.*).

ACS's Director of Clinical Operations, Greg Snider, and its Human Resources Director, John Lewis, notified Vie that there was no light-duty work available to accommodate her restrictions at that time, and that they would let her know if any light-duty work became available. (Doc. 21, Ex. 2 at 80, 173). Shortly after being denied light-duty work at ACS, Vie began working at Vinings Industries in Atlanta, Georgia. (Doc. 21, Ex. 2 at 81; Doc. 26 at Ex. 6).

Vie filed a second charge of discrimination with the EEOC on May 8, 1999, alleging race discrimination and retaliation. (Doc. 26 at Ex. 2). In it, she alleges that Mike Townley treated white employees differently than he treated African-American employees, and that Townley had accused her of being a racist. She further alleges that ACS retaliated against her for filing the December 2, 1998, charge of discrimination. Specifically, she asserts, she was forbidden to discipline residents' disruptive behavior with consequences, confronted about her failure to maintain therapy charts, advised that she was improperly signing in and out of the facility and denied light-duty work after her back injury. (Doc. 27, citing Doc. 26, Ex. 11 at 130-31, 133, 136, 167, 303-04).

### B.    Crystal Reynolds

Crystal Reynolds, a registered nurse, was hired by Eleanor Powers as Nursing Manager prior to ACS's opening in April of 1998. (Doc. 21, Ex. 3 at 82). Reynolds's duties as nursing manager included: administering medications to residents, maintaining the residents' charts, and giving tuberculosis tests and physicals to the employees. (Doc. 21, Ex. 3 at 164, 165). Shortly

5

after her employment, Reynolds requested that Townley hire a licensed practical nurse ("LPN")

or other nursing staff to help her administer medical treatment. (Doc. 21, Ex. 3 at 95, 189).

Reynolds informed Townley that, according to Alabama Board of Nursing Regulations, only

registered nurses ("RN"s) or LPNs could administer medication to the residents. (Doc. 21, Ex. 3

at 95, 159). Townley did not believe Reynolds, and said that she was stupid. (Doc. 21, Ex. 3 at

102). He also made comments about her education, stating that she must have gotten her degree

from Wal-Mart. (Doc. 21, Ex. 3 at 94, 102).

In June of 1998, Reynolds complained to Eleanor Powers about Townley's harassing

conduct, and once her complaints were brought to the attention of John Lewis, ACS's director of

human resources, an investigation was conducted by ACS's vice president Al Smith. (Doc. 21,

Ex. 3 at 110-11). Reynolds claims that Smith ultimately informed all the supervisors that the

investigation had revealed no wrongdoing by Townley and that they should all "shape up" or they

would not have a job. (*Id.*).

In November of 1998, Townley decided to hire another RN, so Eleanor Powers, Greg

Snider and Townley interviewed candidate Stephen DeFranco. (Doc. 21, Ex. 7 at 31; Doc. 21

Ex. 4 at 72). DeFranco was working as House Supervisor at Mountainview Hospital in Gadsden,

Alabama when he responded to ACS's newspaper advertisement seeking candidates for the new

RN position. (Doc. 21, Ex. 4 at 12). DeFranco had significant training and experience with the

regulations and requirements of the Joint Commission of Accreditation of Health Care

Organizations ("JCAHO"), the organization under which ACS was attempting to gain

accreditation. (Doc. 21, Ex. 1 at ¶ 8). DeFranco requested more money than he was making to

leave his job at Mountainview, in part because he would be commuting from Gadsden to work at

6

ACS. (*Id.* at ¶ 9). DeFranco was hired and offered the additional money he requested. (*Id.* at ¶ 10).

In December of 1998, Eleanor Powers and Crystal Reynolds resigned. (Doc. 26, Ex. 7 at ¶ 8; Doc. 26 at Ex.1). When DeFranco began working, he took over the job duties of Reynolds and some of those of Powers, as well. (Doc. 21, Ex. 1 at ¶¶ 12-13).

## III.   MOTION TO STRIKE AFFIDAVITS

Defendant moves the court to strike, in whole or in part, the affidavits of plaintiffs Valerie Vie and Crystal Reynolds, former plaintiff Eleanor Powers, and Albert Nicholas[8] because they fail to meet the requirements of Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE. Rule 56(e) states, in pertinent part, that affidavits in support of or in opposition to a motion for summary judgment ". . . shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). If a supporting or opposing affidavit fails to conform to Rule 56(e), the opposing party may move to strike the nonconforming portion or portions. *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996) (citing *Interfase Mktg, Inc. v. Pioneer Techs. Group, Inc.*, 1993 WL 229601, *2 (M.D. Fla. June 23, 1993)), *aff'd*, 138 F.3d 956 (11th Cir. 1998); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1529 (M.D. Fla. 1989).

Defendant asserts in its motion to strike that the affidavits are due to be stricken, in whole or in part, because (1) the statements contained therein are irrelevant to the determination of this

---

[8]Albert Nicholas was employed by the defendant as a recreational counselor from September 1998 to September 1999. (Doc. 26 at Ex. 9)

matter, (2) they are not premised on the personal knowledge of the affiant, (3) the statements

contained therein are rank hearsay, (4) the statements contained therein are lacking in probative

value because they do not allege specific facts, but mere conclusory allegations, and (5) they

contain statements that directly contradict prior sworn testimony.  (Doc. 29).  The plaintiffs

oppose the motion to strike, arguing that (1) the statements in the affidavits are not hearsay since

they are not offered to prove the truth of the matter asserted but to show the affiants' state of

mind, reflect complaints made in accordance with ACS policy and/or reflect the environment in

which the plaintiffs were required to work; and (2) the affidavits reflect the personal knowledge

of the affiants because they are signed by the affiants.  (Doc. 32).

### B.    Applicable Law

#### 1.    Relevance

Rule 401 of the FEDERAL RULES OF EVIDENCE defines relevant evidence as that "having

*any tendency* to make the existence of any fact that is *of consequence* to the determination of the

action more probable or less probable than it would be without the evidence."  (Emphasis

supplied).  Whether or not any fact is "of consequence" depends on the substantive law at issue.

Rule 402 of the FEDERAL RULES OF EVIDENCE provides that all relevant evidence is admissible.

#### 2.    Personal Knowledge and Conclusory Allegations

"Rule 56(e) of the FEDERAL RULES OF CIVIL PROCEDURE provides that an affidavit

opposing a motion for summary judgment 'shall be made on *personal knowledge*, shall set forth

such facts as would be *admissible in evidence*, and shall show affirmatively that the affiant is

competent to testify to the matters stated therein.'"  *Givhan v. Electronic Engineers, Inc.*, 4 F.

Supp. 2d 1331, 1334 (M.D. Ala. 1998) (emphasis in original) (statement in affidavit that fails to

8

show factual basis for personal knowledge of the matter does not meet the requirements of Rule 56(e))(quoting FED. R. CIV. P. 56(e)); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1048 n.6 (5th Cir. 1996) ("this vague and conclusory statement – which includes no reference to [discriminatory] remarks – fails to 'designate specific facts' – such as what was said, to whom it was said, or even who made the comments – sufficient to avoid summary judgment.").

The Eleventh Circuit has "consistently held that conclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citing *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). The *Leigh* court further states that in order to resist summary judgment, the non-movant must introduce "affidavits setting forth specific facts to show why there is an issue for trial." *Leigh*, 212 F.3d at 1217 (citing *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978)).[9] The court, therefore, cannot consider conclusory allegations contained in affidavits unless they are supported by specific facts.

### 3.   Hearsay

Established Eleventh Circuit precedent allows hearsay statements contained in an affidavit to be considered in opposition to a motion for summary judgment "unless that hearsay will not be reducible to an admissible form at trial." *Daw v. BRK Brands, Inc.*, 1998 U.S. Dist. LEXIS 11098, *8-9 (S.D. Ala. 1998) (citing *Pritchard v. Southern Co. Svcs.*, 92 F.3d 1130 (11th Cir.), *modified on other grounds*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L. Ed. 2d 211 (1997); *McMillian v. Johnson*, 88 F.3d 1573, 1584-85 (11th

---

[9] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Cir. 1996), *affirmed without discussion of issue sub nom.*, *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997); *Church of Scientology Flag Service Org. v. City of Clearwater*, 2 F.3d 1514, 1530 (11th Cir. 1993), *cert. denied*, 513 U.S. 807, 115 S. Ct. 54, 130 L. Ed. 2d 13 (1994); *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1015 & n.1 (11th Cir. 1987)).  Thus, the court may not consider inadmissible hearsay statements contained in an affidavit for the purpose of overcoming a motion for summary judgment.  *Park v. City of Atlanta*, 938 F. Supp. 836, (N.D. Ga. 1996), *rev'd on other grounds*, 120 F.3d 1157 (11th Cir. 1997) (plaintiff's claims dismissed for failure to proffer admissible proof, when the only evidence provided was an affidavit containing hearsay statements of unnamed individuals) (citing FED. R. EVID. 801; *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (concluding district court erred by considering inadmissible evidence in support of motion for summary judgment)).

### C.     Challenged Evidence

#### 1.     Valerie Vie's Affidavit

Defendant moves to strike paragraph 2 of Vie's affidavit on the grounds that it is conclusory and not based on personal knowledge.  (Doc. 29).  Paragraph 2 states as follows

> The Director of the School, Mike Townley, a white male, continually harassed and subjected me to disparate terms and conditions of employment because of my race and gender.  He treated whites and males differently than he treated blacks, especially black females.

(Doc. 26 at Ex. 6).

The motion to strike is due to be granted with respect to paragraph 2 of Vie's affidavit. The first sentence of paragraph 2 states an ultimate issue to be decided by the trier of fact.  Under

10

the Rule 704(a) of the FEDERAL RULES OF EVIDENCE, such a legal conclusion is not objectionable if it is otherwise admissible. However, this conclusory statement lacks specific facts sufficient to support it, and is therefore due to be stricken. Similarly, the second sentence of paragraph 2 is conclusory and fails to allege any specific facts in support of the statement. It is therefore due to be stricken, as well.

Defendant moves to strike paragraph 3 of Vie's affidavit on the grounds that it is hearsay and not based on personal knowledge. With respect to paragraph 3, the motion is due to be granted in part and denied in part. Paragraph 3 states as follows:

> He [Townley] made comments to other employees stating that I was racist, and implied the clients did not have to listen to me and co-workers did not have to work with me. Mr. Townley continually made my job and the atmosphere in which I worked stressful and tense.

(Doc. 26 at Ex. 6). With respect to the allegations in the first sentence, Vie does specify that Townley called her a racist, but there is no indication that this allegation is based on her personal knowledge. It thus appears that the first sentence is due to be stricken. The second sentence, however, is based on Vie's subjective perception of her working environment, which is necessarily based on her personal experience, and is not due to be stricken.

Defendant moves to strike paragraph 4 of Vie's affidavit on the grounds that it is based on hearsay, and/or not based on personal knowledge. Paragraph 4 states as follows:

> Mr. Townley constantly made derogatory comments and discounting remarks to me and about me as well as about any female or black co-worker, even to the point of including any white employee who befriended us. He did not speak in a derogatory manner to the white male employees at ACS.

(Doc. 26 at Ex. 6). Because any statements made by Mr. Townley "about" Vie or any other employee at ACS are hearsay, that portion of the first sentence is due to be stricken unless it falls

11

under a hearsay exception, which the plaintiffs have not alleged is the case.  Insofar as Vie

alleges that Townley made such comments "to" her, those apparently would be admissible and

may be considered by the court.  To the extent the second sentence reflects Townley's behavior

in Vie's presence, it is based on personal knowledge, and when so qualified, may be considered

by the court.  To the extent the statement is based upon Townley's conduct outside of Vie's

presence, however, it would be mere speculation.  In the absence of specific facts sufficient to

indicate that she has personal knowledge of the allegations contained therein, they may not be

considered by the court.

Defendant moves to strike paragraph 5 of Vie's affidavit on the grounds that it is not

based on personal knowledge and is irrelevant.  Paragraph 5 states as follows:

> Mr. Townley would promise to order [supplies] and then fail/refuse to order them.
> I complained about the lack of supplies and the discriminatory manner in which
> Mr. Townley treated me but not my male counterparts.

(Doc. 26 at Ex. 6).

To the extent that the first sentence is based on Vie's experience with Townley, it is

necessarily based on personal knowledge, and is therefore not due to be stricken.  The second

sentence, while based on actions taken by Vie, does not indicate to whom she complained, and is

therefore due to be stricken on relevancy grounds.

Defendant moves to strike the second sentence in paragraph 6 of Vie's affidavit on the

ground that it is not based on personal knowledge.  Paragraph 6 states as follows:

> Mr. Townley ignored me and refused to speak to me and generally treated me in a
> dismissive manner in front of the youths under my charge.  He did not do this to
> my male counterparts.

(Doc. 26 at Ex. 6).  Because the second sentence of paragraph 6 addresses Townley's treatment

12

of others, about which Vie claims no personal knowledge, it is due to be stricken.

Defendant moves to strike paragraph 8 of Vie's affidavit on the ground that it directly contradicts her prior sworn deposition testimony without valid explanation and is not based on personal knowledge. Paragraph 8 states as follows:

> When I was told by my doctor that I could return to work on "light duty," Mr. Townley refused to let me and told me there was no "light duty" even though a white male, Jimmy Adams, III, had been formerly put on light duty.

(Doc. 26 at Ex. 6). Vie states that Townley refused to let her work light duty and told her that there was no light duty. In her deposition and brief in opposition to defendant's motion for summary judgment, however, she claims that John Lewis and Greg Snider told her to go home and informed her that no light duty was available. (Doc. 26 Ex. 11 at 173; Doc. 27 at 24). Because Vie has provided no explanation for the inconsistency, the first statement is due to be stricken. Because Vie provides no facts to indicate that she has personal knowledge regarding light duty work provided to a white male, this statement is due to be stricken as well.[10]

Defendant moves to strike paragraph 9 of Vie's affidavit on the ground it is not based on personal knowledge. Paragraph 9 states as follows:

> After I filed the EEOC charge on December 2, 1998, Mr. Townley retaliated against me by becoming more derisive to me, by ignoring me, by being highly critical of everything I did, and by continuing to make comments that I was a racist. I was also retaliated against by being given reprimands for signing in/out in back instead of in the front of the building and was denied light duty work where males had been allowed light duty.

(Doc. 26 at Ex. 6). Because Vie provides no specific facts to indicate whether she had personal

---

[10]The court also notes that Vie's statement includes no indication as to when Adams allegedly was given a light duty job, nor does it include other facts that would reveal the relevancy of Adam's circumstances to the case at hand.

knowledge of Townley's comments about her, the statement that Townley continued to make comments that she was racist is due to be stricken.[11]  Additionally, because Vie does not state specific facts in support of her assertion that males had been allowed light duty, such as the details of these circumstances for comparison purposes, that portion of the last sentence is due to be stricken.

### 2.    Crystal Reynolds's Affidavit

Defendant moves to strike paragraph 2 of Reynolds's affidavit on the ground that it is conclusory and not based upon personal knowledge.  It provides as follows:

> The Director of the School, Mike Townley, a white male, continually harassed and subjected me to disparate terms and conditions of employment because of my race and gender.  He treated whites and males differently than he treated blacks, especially black females.

(Doc. 26 at Ex. 8).  Because paragraph 2 of Reynolds's affidavit is identical to paragraph 2 of Vie's affidavit, it is also due to be stricken.

Defendant moves to strike portions of paragraph 3 of Reynolds's affidavit on the ground that it is hearsay.  Paragraph 3 states as follows:

> [Townley] made comments to me and in the presence of other employees saying I was stupid and telling them I had graduated from Wal Mart.

(Doc. 26 at Ex. 8).  Because Reynolds does not allege specific facts indicating in whose presence the comments were made, or whether she was present at the time they were made, the portion of her statement regarding comments made in the presence of "other employees" is due to be stricken.

---

[11]In fact, Vie stated in her deposition that she merely heard other employees saying that Townley had said she was racist.  (Doc. 26, Ex. 11 at 215).

Defendant moves to strike paragraph 5 of Reynolds's affidavit on the grounds that it is hearsay and not based on personal knowledge.  Reynolds alleges in paragraph 5 that "[a]fter Mr. DeFranco arrived, he was allowed to hire a new nurse within a few weeks." (Doc. 26 at Ex. 8). Because Reynolds resigned from her employment with ACS prior to Mr. DeFranco's arrival, any information concerning his employment with ACS cannot be based on her personal knowledge and is therefore due to be stricken.  Her affidavit gives no indication as to what knowledge this statement is premised upon.

Defendant moves to strike paragraph 6 of Reynolds's affidavit on the ground that it is not based upon personal knowledge.  Paragraph 6 states as follows:

> Mr. Townley yelled and screamed at me and other females and frustrated my efforts to perform my job.  He demeaned and humiliated me and other females before my peers with his aggressive and mean behavior.  He did not treat the males in this demeaning manner in front of others.

(Doc. 26 at Ex. 8).  Because Reynolds does not provide specific facts indicating that other employees were so treated in her presence, she cannot show that she has personal knowledge of such events. The court cannot speculate as to whether she observed Townley's treatment of other females or whether she learned of such conduct from other sources.  Accordingly, the portions of paragraph 6 pertaining to Townley's treatment of other employees are due to be stricken.

Defendant moves to strike a portion of paragraph 7 of Reynolds's affidavit on the grounds that it is hearsay and not based on personal knowledge.  The challenged portion of paragraph 7 states that "Mr. Townley began . . . asking other employees to watch me." (Doc. 26 at Ex. 8). Because paragraph 7 is apparently based on requests made by Townley to "other" unnamed employees, it is not based on personal knowledge, but is hearsay, and is therefore due to be

15

stricken.

Defendant moves to strike paragraph 8 of Reynolds's affidavit on the grounds that it is

hearsay and is not based on personal knowledge.  Paragraph 8 states as follows:

> A male nurse, Mr. DeFranco, was hired at a higher starting salary than me when
> he had only three years nursing experience and I had over seventeen (17) years
> nursing experience, including seven years in psychiatric mental health.

(Doc. 26 at Ex. 8).  Because Reynolds resigned from her employment with ACS prior to Mr.

DeFranco's arrival, any information concerning his employment with ACS cannot be based on

her personal knowledge and is therefore due to be stricken.  In addition, the court notes that she

has not specified the basis for her conclusion.

### 3.    Eleanor Powers's Affidavit

Defendant moves to strike paragraph 3 of Powers's affidavit on the grounds that it is

hearsay.  In paragraph 3, Powers states that she "hear[d] complaints that Mr. Townley said I hired

too many blacks."  (Doc. 26 at Ex. 7).  Because Powers's statement is based on hearsay

statements of unknown individuals relaying further hearsay statements allegedly made by

Townley, it is due to be stricken.

Defendant moves to strike paragraph 6 of Powers's affidavit on the grounds that it is

based on hearsay and not on personal information.  Paragraph 6 states as follows:

> I received complaints from Valerie Vie that Mr. Townley would promise to order
> supplies and then simply would not make the order . . .

(Doc. 26 at Ex. 7).  To the extent this statement is offered as proof that she did, in her capacity as

Director of Clinical Operations, receive complaints from Vie regarding Townley, the statement is

due to be considered.

16

Defendant moves to strike paragraph 7 of Powers's affidavit on the grounds that it is

based on hearsay and is conclusory. Paragraph 7 states as follows:

> I received complaints from almost every female on the staff about Mr. Townley's
> obtuse behavior toward women and the ridiculing that he subjected them to
> around meetings with their colleagues. There was no question in my mind that
> Mr. Townley's behavior toward women was deliberate and intentionally
> calculated to demean and ridicule females.

(Doc. 26 at Ex. 7). The first sentence of paragraph 7 is not supported by specific facts, including

names or number of women who complained, or the specific matters about which they

complained. Because, however, this sentence reflects Powers's perception of the extent of the

problems concerning Townley and the employees under her supervision in her capacity as the

defendant's Director of Clinical Operations, it will be allowed. The second sentence, on the

other hand, is so conclusory that it is due to be stricken to the extent it is intended to prove

harassment.

Defendant moves to strike a portion of paragraph 8 of Powers's affidavit on the grounds

that it is not based upon personal knowledge. Paragraph 8 states as follows:

> Mr. Townley often derided and ridiculed Crystal Reynolds both in meetings and
> out and she complained to me on many occasions.

(Doc. 26 at Ex. 7). While Powers does not provide specific facts to indicate whether she was

present to witness Townley's treatment of Reynolds, this statement appears to be an explanation

of the substance of Reynolds's complaints made to Powers in her capacity as Director of Clinical

Operations, and is therefore will be allowed.

### 4.   Albert Nicholas's Affidavit

Defendant moves to strike the entire affidavit of Albert Nicholas on the grounds that he

17

does not affirmatively state that he is competent to testify concerning the matters therein, that the

statements therein are not based on personal knowledge, and that the statements are hearsay and

conclusory and/or irrelevant.  Paragraph 1 of Nicholas's affidavit states as follows:

> I was employed by Children's Comprehensive Services, Inc. from September
> 1998 to September 1999 as a Recreational Therapist, at Alabama Clinical School
> (ACS) in Birmingham, Alabama and worked alongside Valerie Vie, one of the
> Plaintiffs in this lawsuit, during her tenure there.  I was also familiar with other
> female staff members, including Crystal Reynolds.

(Doc. 26 at Ex. 9).  The statements contained in paragraph 1 refer to Nicholas's employment at

ACS, and are therefore based on personal knowledge and are not due to be stricken.

Paragraph 2 of Nicholas's affidavit states as follows:

> The Director of the School, Mike Townley, a white male, continually harassed
> and subjected Ms. Vie to disparate terms and conditions of employment because
> of her race and gender.  He treated whites and males differently than he treated
> blacks, especially black females.

(Doc. 26 at Ex. 9).  Because paragraph 2 does not contain specific facts sufficient to indicate that

the statements are based on personal knowledge or to support the conclusory allegations

contained therein, it is due to be stricken.

Paragraph 3 of Mr. Nicholas's affidavit states as follows:

> I am familiar with the fact that Mr. Townley made derogatory and demeaning
> comments regarding Ms. Reynolds and her job performance in the presence of
> other employees including his stating that she had gotten her nursing degree from
> Wal Mart.  He did not make derogatory or demeaning comments about males.

(Doc. 26 at Ex. 9).  Because paragraph 3 does not contain any specific facts sufficient to indicate

that the statements are based on personal knowledge or experience, it is due to be stricken.

Paragraph 4 of Nicholas's affidavit states as follows:

> Ms. Townley requested that Ms. Vie decorate the bulletin board used to display

18

> schedules, announcements, etc. each month. She and I took turns decorating the board after she purchased the pre-made art materials. When Mr. Townley saw the board that Ms. Vie had decorated he made demeaning and derogatory comments and complained that she should know that the board was for business only. He made no such derogatory comments in reference to the board I had decorated with the very same type of art materials.

(Doc. 26 at 9). Because the court cannot discern the basis of Nicholas's knowledge for the

information contained in the first and third sentences, those sentences are due to be stricken. The

remainder of this paragraph is apparently based on Nicholas's personal experience and is

therefore not due to be stricken.

> Paragraph 5 of Nicholas's affidavit states as follows:

> Mr. Townley yelled at Ms. Vie and other females and frustrated their efforts to perform their jobs. He did not treat the males in this demeaning manner in front of others.

(Doc. 26 at Ex. 9). Because there is no indication that the statements in paragraph 5 are based on

personal knowledge, that paragraph is due to be stricken. For the court to find otherwise would

require it to indulge in speculation as to the basis of Nicholas's knowledge.

> Paragraph 6 of Nicholas's affidavit states as follows:

> In order to perform her job, Ms. Vie required certain equipment/supplies. She told me she frequently complained to Mr. Townley prior to my being hired and requested these much-needed supplies, but he would tell her, "We discussed this before, and you're not getting any." Within one week of my employment at ACS, I also complained to Mr. Townley about the deteriorated condition of the recreational equipment/supplies and requested that new supplies be purchased. He immediately granted my request whereupon I went to Wal Mart and, using the school's account, purchased everything that had been requested.

(Doc. 26 at Ex. 9). The first sentence of paragraph 6 appears to be based upon his experience

detailed in the final paragraph of the affidavit and is therefore due to be considered. The second

sentence is based on communications between Vie and Townley which preceded Nicholas's

employment with the defendant and is therefore hearsay. It is thus due to be stricken. The

remainder of paragraph 6 is based on Nicholas's personal experience with Townley, and will

therefore be considered by the court.

> Paragraph 7 of Nicholas's affidavit states as follows:

> Since the inception of my employment at ACS I have signed in/out at the nurses' station located at the back of the facility. All staff members that work with the students use that same location to log in/out. I was never given a verbal or written warning or reprimand with regards to this issue.

(Doc. 26 at Ex. 9). The second sentence in paragraph 7 concerns other staff members' practice of

signing in/out. Because Nicholas fails to state the basis of his knowledge for the statement, it

must be stricken. The remainder of paragraph 7 is based on Nicholas's personal employment

practice and experience and is therefore not due to be stricken.

## IV.    MOTION FOR SUMMARY JUDGMENT

The court shall grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986). Initially, the moving party bears the burden of proof "to show the

district court, by reference to materials on file, that there are no genuine issues of material fact

that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

The moving party can satisfy his burden by presenting evidence that there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at

322-323; FED. R. CIV. P. 56(a) and (b).

Should the moving party meet his burden of proof, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark,* 929 F.2d at 608. Material facts are those that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Genuine material facts are those material facts that could cause a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Celotex,* 477 U.S. at 324.

The court should consider the pleadings, depositions, and affidavits in the case before reaching its decision, and all reasonable inferences should be made in favor of the nonmovant. *Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir. 1992). The judge's role is "not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

With respect to motions for summary judgment in Title VII disparate treatment cases such as this, where the claims are based upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. CT. 1817, 1824, 36 L. Ed. 2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 & n.6, 101 S. Ct. 1089, 1094 & n.6, 67 L. Ed. 2d 207 & n.6; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28, *cert. denied,* 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997). The employer may rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse

employment action. *McDonnell Douglas,* 411 U.S. at 802. The plaintiff may overcome the employer's reasons by showing that they are but a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804.

### A.    Hostile Work Environment Claims Based Upon Sexual Harassment

In order to establish a claim for hostile environment discrimination based upon sexual harassment under Title VII, an employee must demonstrate (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.[12] *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999) (citing *Henson v. Dundee,* 682 F.2d 897, 903-905 (11th Cir. 1982)), *cert. denied,* 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000). As is explained below, the plaintiffs do not meet each of these requirements with respect to their claims.

### 1.    The First, Second and Third *Mendoza* Factors

---

[12] The Supreme Court has held that where an employee asserts claims based on a supervisor's harassment, the employer may be vicariously liable for actionable hostile environment discrimination caused by a supervisor with immediate (or successively higher) authority over the employee, subject to the affirmative defense of promulgating an appropriate anti-discrimination policy which the employee has unreasonably failed to utilize. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S. Ct 2257, 2270, 141 L. Ed. 2d 633 (1998). A supervisor's harassing actions are not actionable under Title VII, however, unless the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Mendoza,* 195 F.3d at 1245 (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49, 60 (1986) (quoting *Henson,* 682 F.2d at 904)).

The plaintiffs clearly meet the first two *Mendoza* factors: they are females who have demonstrated that they were subjected to unwelcome harassment in the form of Townley's alleged mistreatment of them. There is not sufficient evidence, however, to allow the plaintiffs to meet the third *Mendoza* factor. The statements and conduct complained of "must be of a sexual or gender-related nature [] before they are considered in determining whether the severe or pervasive requirement is met." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir.), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2000); *see also Mendoza*, 195 F.3d at 1245. "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." *Gupta*, 212 F.3d at 583. "Title VII, as it has been aptly observed, is not a 'general civility code'." *Id.* (quoting *Faragher*, 524 U.S. at 788).

The plaintiffs allege that Townley behaved in a condescending manner toward all his female subordinates. They allege that Townley's conduct was consistently hostile toward women, and that he treated women employees differently from male employees. As evidence of this, the plaintiffs point to the testimony of Eleanor Powers, who stated in her affidavit that she had received complaints from "almost every female on the staff about Mr. Townley's obtuse behavior toward women and the ridiculing that he subjected them to around meetings with their colleagues." (Doc. 26 at Ex. 7).

The plaintiffs also point to the testimony of Stephen Davis, a disinterested non-party and former co-worker of the plaintiffs. Davis testified that he had complained that female employees were unfairly treated, and had threatened to quit if the abusive treatment did not cease. (Doc. 26, Ex. 12 at 125-126). He testified that he was not aware that Townley ever asked for any woman's

opinion and was dismissive of any unsolicited opinions voiced by women.  (Doc. 26, Ex. 12 at

117-118).  Davis also testified that, in his opinion, Townley's hostility was directed more toward

females.  (Doc. 26, Ex. 12 at 125-126).  Davis further testified as to specific instances of

Townley's abusive treatment toward non-party females with respect to their job performance or

suggestions made by them.  (Doc. 26, Ex. 12 at 30-32) (Townley was "verbally aggressive" with

several female employees: he yelled at one, saying that she did not do her job correctly; he

rejected the suggestion of another, telling her that she did not know what she was doing and that

she should do as she was told; and he told another that she was damaging the clients, that she did

not know what she was doing, and that she should not "tell him what to do with her clients, that

he knew what to do with them better than she did.")

The testimony of Davis and Powers with respect to their knowledge of Townley's general

behavior toward women does not demonstrate that Townley harassed all female employees or the

plaintiffs in particular based upon their sex.  Powers's testimony is based upon subjective

complaints made to her by female staff members, whose knowledge of Townley's comparative

behavior toward female and male employees is undemonstrated.  Powers's testimony is therefore

not a proper basis upon which to conclude that Townley harassed female employees in general or

the plaintiffs in particular based upon their sex.  Although Davis's testimony contains some

particular examples of Townley behaving rudely or abusively toward female employees, there is

little indication that Davis was in a position to adequately compare Townley's behavior toward

female employees to Townley's behavior toward male employees generally.  The plaintiffs have

thus failed to demonstrate that Davis's testimony is a proper basis upon which to conclude that

Townley harassed female employees in general or the plaintiffs in particular based upon their

sex.

Next, the plaintiffs present evidence of Townley's behavior toward them in particular, and argue that it supports the conclusion that he harassed them because of their sex. They articulate only a few specific instances of individual mistreatment during which Townley yelled or screamed at them in meetings with colleagues, generally about their alleged performance. The plaintiffs have not, however, alleged facts sufficient to demonstrate that Townley's behavior in the meetings was gender-related, as is discussed below.

Reynolds claims that Townley called her stupid, an idiot, and commented to numerous people that she must have gotten her degree from Wal-Mart. (Doc. 27 at 3). She alleges that Townley opposed her advice regarding the rules and regulations of the Alabama Board of Nursing and failed to hire any nursing assistance for her. (*Id*. at 3-4). Reynolds does not assert, however, any basis for concluding Townley's challenged behavior toward her was related to her gender. "It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory." *Gupta*, 212 F.3d at 585 (quoting *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999)).

Vie alleges that Townley failed to provide supplies she had requested for the residents' recreation. (Doc. 27 at 6-7). He also allegedly ignored her, failed to meet with her for scheduled appointments, spoke rudely or in a demeaning fashion to her in group meetings, and criticized her performance. (*Id* at 7-8). The evidence regarding Townley's alleged conduct towards Vie, however, is insufficient to show that the conduct is related to Vie's gender.

25

The plaintiffs did present evidence that Townley mentioned he would prefer a male employee to perform Vie's duties. Davis testified that Townley commented that Vie was not doing a good job and that a man would be better suited for her position. (Doc. 26, Ex. 12 at 26). Although this is one instance in which Townley made a blatantly gender-based remark about who would be suitable for a job he thought the plaintiff was performing badly, it is not enough to show that the complained-of behavior was based upon the gender of the plaintiffs so as to satisfy the third *Mendoza* factor.

Although Townley's challenged behavior towards the plaintiffs was not apparently based upon gender, the plaintiffs argue that the behavior "resulted in a '...management style [that] was more offensive to female employees than male employees.'" (Doc. 27 at 15). In so arguing, the plaintiffs rely upon the Eleventh Circuit decision in *Cross v. State of Alabama*, 49 F.3d 1490, 1505 (11th Cir. 1994), in which the court found that the trial court did not err in questioning witnesses as to whether the defendants considered whether a manager's management style was more offensive to female employees than to male employees. (*Id.*). The type of conduct addressed in *Cross* is not analogous to the conduct here alleged, however. The *Mendoza* Court, in finding a baseline of conduct which rises to the level of actionable sexual harassment, distinguished the conduct before it from the more gender-specific and extreme conduct examined in *Cross. Mendoza*, 195 F.3d at 1249 n.8.[13]

---

[13]The *Mendoza* court distinguished the behavior before it from that at issue in *Cross*, noting that in *Cross*, "the harasser threw objects at the women daily, yelled, screamed and belittled them, and engaged in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching with women, but never engaged in this conduct with his male employees. The *Cross* court described the harasser's manner of communicating with female employees as 'extremely hostile, very angry, very aggressive' and 'demeaning' but as 'very professional' with male employees. The harasser's derogatory comments to women included 'women belonged

This court is not convinced that the conduct before it approaches the conduct described in *Cross*. The court declines to find that the third *Mendoza* factor is met because of any "management style" issues such as those cited by the *Cross* court.

### 2.    The Fourth *Mendoza* Factor

Even if the plaintiffs had fully satisfied the third *Mendoza* factor with respect to each of their claims, they still could not avoid summary judgment because they fail to satisfy the fourth *Mendoza* factor, which requires that the harassment be "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Mendoza*, 195 F.3d at 1245.

Establishing the fourth *Mendoza* factor includes a subjective and an objective component. *Mendoza* 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The employee must "subjectively perceive" the harassing conduct as "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and this perception must be objectively reasonable. *Id.* The employee's working environment must be such that, considering all the circumstances, a reasonable person in the employee's position would consider it hostile and abusive, and the employee must subjectively believe it to be abusive as well. *Mendoza*, 195 F. 3d at 1246 (citing *Oncale v. Sundowner*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L. Ed. 2d

---

barefoot and pregnant,' 'fat butt,' 'a butt head,' 'a cow,' 'rather dumb,' 'stupid,' and 'just a woman.' The harasser told 'sexual and dirty jokes,' and said, 'I guess women are taking over things' and made comments that mistakes would not happen if males were in the position of decision making. The harasser had an affair with a female employee who testified that he described women as less intelligent than men and said they 'cause a lot of trouble, and the facility would be better off with men than women.'"

27

201, 208 (1998)).

The Eleventh Circuit has stated that "[t]he objective component of the 'severe and pervasive' element prevents 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' from falling under Title VII's broad protections." *Gupta*, 212 F.3d at 583 (quoting *Faragher*, 524 U.S. at 778). The statements and conduct complained of must be examined collectively to determine whether they meet the objective threshold for sufficiently severe or pervasive conduct which would satisfy the fourth *Mendoza* factor. *Gupta*, 212 F.3d at 583; *see also Mendoza*, 195 F.3d at 1246.

In determining the objective component of this analysis, the Supreme Court considers four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23; *Mendoza* 195 F.3d at 1246 (citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997)). The conduct should be considered in the totality of the circumstances, not in terms of isolated incidents, to determine "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the employee's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246.

Reynolds testified that Townley said that she had gotten her degree at Wal-Mart and openly questioned her intelligence. He refused to hire an assistant to help her and rejected her advice about the administration of medication. Reynolds also offers the testimony of Davis in support of her claim, but Davis testified that he "never saw him [Townley] and Crystal [Reynolds] interact that much," although he did hear Townley comment that Reynolds was stupid

28

and had received her degree at Wal-Mart. (Doc. 26 Ex. 12 at 108). Reynolds heard these remarks herself and was offended by them. It appears, however, that these remarks were limited in time and that they did not affect Reynolds's job performance. Nor was the conduct physically threatening or humiliating, although it was unquestionably offensive, by any objective standard. Townley's treatment of Reynolds in this regard therefore does not satisfy the fourth *Mendoza* factor.

The plaintiffs also offer Davis's testimony about Townley commenting that Vie was not doing a good job and that a man would be better suited for her position. (Doc. 26, Ex. 12 at 26). Vie, however, was not present when the statement was made, nor is there any indication that she was aware of the statement. Because there is no evidence that Vie heard this comment or was in any way aware of it during her employment with the defendant, this she cannot satisfy the "subjective" component of the fourth *Mendoza* factor analysis with respect to the comment. *See Gupta*, 212 F.3d at 583 (citing *Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788).

In support of their hostile environment claims, the plaintiffs also offer evidence that Townley yelled at them in front of colleagues, that he refused to allocate Vie the appropriate supplies she needed to do her job and that he confronted Vie about her record-keeping and restricted her ability to discipline her charges. The behavior challenged by the plantiffs does not meet the fourth *Mendoza* factor. Thus, they cannot defeat the defendant's motion for summary judgment with respect to their sexual harassment claims.

**B.    Hostile Environment Claims Based Upon Race**

Vie asserts a claim under Title VII and § 1981 for hostile work environment based upon

racial harassment. [14]  Courts have applied the standards for analyzing alleged sexual harassment to racial harassment claims as well. *See Faragher v. City of Boca Raton*, 524 U.S. at 787, n. 1. *See also Mason v. City of Tampa*, 2000 WL 33245472, *5 (M.D. Fla. 2000). The court will therefore analyze Vie's racial harassment claims using an adapted *Mendoza* analysis. Accordingly, for Vie to state a racial harassment she must demonstrate (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on her race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Mendoza*, 195 F.3d at 1245 (citing *Henson*, 682 F.2d at 903-905 (11th Cir. 1982)).

### 1.    The First, Second and Third *Mendoza* Factors

In applying the *Mendoza* analysis here, the court notes that Vie satisfies the first and second requirements for establishing a hostile environment claim: she is African-American, and was subject to unwelcome harassment in the form of Townley's yelling at or ridiculing her, accusing her of treating the African-American residents more favorably, and calling her a racist. The court will assume without deciding for the purposes of this discussion that Vie could also meet the third *Mendoza* factor by showing that the challenged behavior was based on her race. Since Vie clearly cannot state a racial harassment claim under the fourth *Mendoza* factor, however, as is explained below, the defendant is due summary judgment on that claim.

---

[14]"[T]he analysis for determining whether a defendant intentionally interfered with an employment contract under § 1981 is the same as that employed under Title VII [42 U.S.C. § 2000e, *et seq.*]." *Ferrill v. The Parker Group, Inc.*, 967 F. Supp. 472, 474 (N.D. Ala. 1997), *aff'd*, 168 F.3d 468 (11th Cir. 1999). The court will therefore analyze the plaintiffs' § 1981 claims under the law that has developed under Title VII.

2.    **The Fourth *Mendoza* Factor**

As is set forth in the section discussing the plaintiffs' sexual harassment claims, the

analysis of the fourth *Mendoza* factor includes both a subjective and objective component.  The

employee must "subjectively perceive" the harassing conduct as such, and this perception must

be objectively reasonable.  *Id.*  The employee's working environment must be such that,

considering all the circumstances, a reasonable person in the employee's position would consider

it abusive, and the employee must subjectively believe it to be abusive as well.  *Mendoza*, 195 F.

3d at 1246.

In determining the objective component of this analysis, the Supreme Court considers

four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether

the conduct unreasonably interferes with the employee's job performance.  *Harris*, 510 U.S. at

23; *Mendoza* 195 F.3d at 1246.  The conduct should be considered in the totality of the

circumstances, not in terms of isolated acts, to determine "whether the harassing conduct is

sufficiently severe or pervasive to alter the terms or conditions of the employee's employment

and create a hostile or abusive working environment."  *Mendoza*, 195 F.3d at 1246; *Allen*, 121

F.3d at 647; *Harris*, 510 U.S. at 23; *Henson*, 682 F.2d at 904.

Vie offers evidence relating to several incidents in support of her racial harassment claim.

Vie asserts that Townley's inquiries regarding the racial diversity and hiring tendencies of the

staff in relation to the racial composition of the residents at the facility evidence racial animus.

Vie also cites Davis's testimony that Townley did not invite black males into his office, and

commented that "the black staff" were not doing their job.  Vie infers discriminatory intent from

31

Townley's "tone" when speaking about an African-American male employee, and from Townley's statement that Reynolds "hangs with you too." (Doc. 21, Ex. 2 at 212-213). Vie claims that Townley told others that she was a racist and accused her of treating the African-American residents more favorably than the white residents and then commenting that it was "only natural." (Doc. 21 Ex. 2 at 215, 217). In addition, Vie asserts that Townley's comment to Reynolds that she should not trust "the blacks" is evidence of racial animus. (Doc. 21 Ex. 2 at 200-201).

Townley's statements regarding the racial diversity of the staff and hiring practices with respect thereto, were apparently limited in time and frequency and were made in the context of Townley's review of the racial diversity of the staff in proportion to the racial distribution of the residents. (Doc. 21, Ex. 2 at 221-222; Doc. 21, Ex. 6 at 56-58; Doc. 26, Ex. 12 at 72).[15] Vie has not shown that such statements were frequent, severe, physically threatening or humiliating. It is doubtful that they would constitute so much as a mere offensive utterance. There is no evidence that they interfered with Vie's job performance.

Davis testified that no African-American males were ever in Townley's office, implying that Townley never invited African-Americans into his office. (Doc. 21, Ex. 12 at 114). Yet Davis contradicted himself by stating that two African-American males, Ricky Walker and Darnell Lowry, went into Townley's office to talk. (Doc. 26, Ex. 12 at 115, 123). Furthermore, as Davis stated, people wanting to talk to Townley generally stopped in to talk, without a formal invitation from him. This evidence is irrelevant to Vie's racial harassment claims. There is no

_____

[15] According to John Lewis, the percentage of African-American employees was approximately 70 percent, while the percentage of African-American residents was approximately 30 percent. (Doc. 21, Ex. 5 at 109-111).

32

allegation that Vie ever attempted to stop by Townley's office, nor any indication that visiting or not visiting Townley's office would substantively impact the analysis of Vie's racial harassment claim.

With respect to Townley's comment that the blacks were not doing their job, Davis testified that Townley made this statement upon noting that two African American male employees were tardy to work. (Doc. 26 Ex. 12 at 33-34). However unwise or improper it may have been to refer to the two tardy employees in terms of their race, the statement was not made to Vie or in her presence, and does not, therefore, meet the requirement that the statement be subjectively perceived as discriminatory. Even if Vie had heard the comment, there is no indication that it would meet the objective component of the fourth *Mendoza* factor: it was not frequent or severe, it was not physically threatening or humiliating and it would not have been likely to interfere with Vie's job performance.[16]

Vie complains that Townley used a derogatory tone in speaking of an African-American employee when he commented that one particular employee should be a supervisor and that another should not. (Doc. 21, Ex. 2 at 212-213) Vie's inference is based on nothing more than her own subjective perception of "the way he [Townley] sa[id] it." (*Id.* at 213). Vie does not demonstrate that such an incident would meet the objective component of the fourth *Mendoza* factor, nor could she, given the evidence before the court. It was not frequent or severe; it was not physically threatening or humiliating and it did not interfere with Vie's job performance.

Similarly, Vie noted that Townley once asked her whether she liked Reynolds, and when

---

[16]The court notes that, even considering all the incidents Vie offers to support her racial harassment claim together, they still could not be characterized as frequent or severe.

she had nothing bad to say about Reynolds, Townley stated "yeah, because she hangs with you too." (Doc. 21, Ex. 2 at 212).  Vie may have subjectively believed that Townley's statement indicated racial animus, although that is not apparent from the face of the statement.  Even if the statement satisfies the subjective component of the fourth *Mendoza* factor, it fails to satisfy the objective component: it was not frequent and severe; it was not physically threatening or humiliating; and it did not interfere with Vie's job performance.

Townley's suggestion to Vie that she was showing favorable treatment to African-American residents and that such favorable treatment was "only natural," would not satisfy the objective component of the fourth *Mendoza* factor.  (Doc. 26, Ex. 11 at 215).  It was a single statement that was not severe, physically threatening or humiliating, or even an offensive utterance, and it did not interfere with Vie's job performance.

Vie's claim that Townley told her co-workers and residents that she was a racist does not meet the objective component of the fourth *Mendoza* factor.  The statement was not frequent, severe, physically threatening or humiliating.  "Under the standards applied in this circuit for evaluating whether there is sufficient evidence of severe and pervasive harassment, 'mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently implicate Title VII.'" *Gullatte v. WestPoint Stevens, Inc.*, 100 F. Supp. 2d 1315 (M.D. Ala. 2000) (quoting *Harris, Inc.*, 510 U.S. at 22).  Neither did it interfere with Vie's job performance.

Similarly, Townley's comment to Reynolds that she should be careful of who she was friends with because "you can't trust the blacks," (Doc. 26, Ex. 10 at 200-201), would fail both components of the fourth *Mendoza* factor.  It was not said to Vie or in her presence, so it would

34

fail the subjective component. It would also fail the objective component because it was not frequent or severe, it was not physically threatening or humiliating, and it did not interfere with Vie's job performance. *See Evans v. Pemco Aeroplex, Inc.*, 1998 U.S. Dist. LEXIS 22954, *14 (N.D. Ala. Feb. 23, 1998) (because the plaintiff's work performance was not affected, the incidents of racist conduct, which could be physically threatening, including the use of nooses and the letters "KKK," were not sufficiently severe and pervasive to alter a term or condition of employment); *see also Smith v. Beverly Health and Rehabilitation Svs.*, 978 F. Supp. 1116, 1120 (N.D. Ga. 1997) (merely highlighting a couple of utterance of racial epithets as evidence is not sufficient to state a claim for hostile work environment harassment).

The evidence provided by Vie, taken as a whole, does not rise to the level of being "sufficiently severe or pervasive" as required to make out a prima facie case of discrimination. None of it succeeds in meeting all the factors listed in *Mendoza*. The behavior Vie complains of is not severe or frequent. Some of the behavior was not even directed toward Vie or carried out in her presence. The behavior was not physically threatening, humiliating, or offensive, nor did it interfere with her job performance. Because Vie has failed to meet the *Mendoza* test with respect to her hostile environment race harassment claim, the defendant's motion for summary judgment is due to be granted with respect to that claim.

## C.     Hostile Work Environment Claims Based Upon Race Association

Reynolds claims that she was harassed because of her association with African-American individuals.[17] As evidence, she cites Townley's comment that she should be careful of who she

---

[17]Under Title VII and 42 U.S.C. § 1981, claims for harassment because of a person's association with a member of a protected class are not specifically enumerated, but have been read into the statutes by the courts. These claims are justified and actionable under Title VII and

was friends with because "you can't trust the blacks," Townley's failure to introduce "corporate people" to her when she was standing or talking with African-American co-workers, and the fact that Townley was aware that she had African-American friends outside of work.  (Doc. 26, Ex. 10 at 200-202, 204).

The behavior challenged by Reynolds does not rise to the level of actionable harassment. It does not satisfy the objective component of the fourth *Mendoza* factor, which requires that the alleged conduct or statements be frequent, severe, physically threatening or humiliating, or that they affect her job performance.  Townley's statement with regard to Reynolds's trusting blacks is not severe, physically threatening, or  humiliating, nor is Townley's alleged failure to introduce "corporate people" to Reynolds when she was associating with African-Americans.  None of these alleged consequences Reynolds experienced by virtue of her association with African-Americans, taken together or separately, evidences that her working conditions were affected so as to meet the *Mendoza* test.  Because Reynolds cannot make out a prima facie case of race association hostile environment discrimination, the defendant's motion for summary judgment on her claims is due to be granted.

### D.    Constructive Discharge

In order for a plaintiff to prove constructive discharge, she must "demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Graham v. State Farm Mutual Insurance Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221,

---

§ 1981, when an individual is discriminated against on the basis of her relationship and/or association with a member or members of a particular race or national origin. *Parr v. Woodmen of the World Life Insurance Co.*, 791 F.2d 888 (11th Cir. 1986).

114 S. Ct. 2708, 129 L. Ed. 2d 836 (1994)).  Because the Court has employed an objective

"reasonable person" standard, the plaintiff's subjective feelings are not determinative.  *Graham*,

193 F.3d at 1282 (citing *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1450 (11th Cir.

1998)).  The Court has further held that "[p]art of an employee's obligation to be *reasonable* is

an obligation not to assume the worst, and not to jump to conclusions too fast."  *Garner v. Wal-*

*Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (emphasis in original).

Reynolds claims that she resigned because of "stress from the overbearing and demeaning

gender-related conduct of Mr. Townley and lack of help."  (Doc. 26, Ex. 8 at ¶ 8).

She also implies that she resigned due to her belief that the defendant hired DeFranco to replace

her.[18]  The court is not convinced that Reynolds has met her burden with respect to this claim.

In addressing a claim of constructive discharge in the age discrimination context, the

Eleventh Circuit stated as follows:

> The standard for proving constructive discharge is higher than the standard for
> proving a hostile work environment. *Landgraf v. USI Film Prods.*, 968 F.2d 427,
> 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must
> demonstrate a greater severity or pervasiveness of harassment than the minimum
> required to prove a hostile working environment."), *aff'd*, 511 U.S. 244, 114 S. Ct.
> 1483, 128 L. Ed. 2d 229 (1994); *see also Steele v. Offshore Shipbuilding, Inc.*,
> 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that
> Title VII plaintiffs were subjected to hostile work environment, but were not
> constructively discharged); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d
> 900, 905-06 (11th Cir. 1988) (same).

*Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).  Thus, if the facts do not

---

[18]The basis for Reynolds's belief in this respect is unclear.  Reynolds had requested
additional nursing staff to be hired; her suit, in fact, is premised in part on the defendant's alleged
failure to hire additional staff.  Also, Reynolds resigned two weeks prior to DeFranco's start date,
without any knowledge of the duties assigned to DeFranco or any indication that he was hired to
replace her.  (*See* Doc. 26, Ex. 8 at ¶¶ 8-9 and Ex. 10 at 187).

meet the less-demanding standard required for a finding of a hostile environment in *Mendoza* (the "working environment must be such that, considering all the circumstances, a reasonable person in the employee's position would consider it hostile and abusive") they are necessarily insufficient to establish an environment so intolerable that a reasonable person in her position would be compelled to resign.

Because the conduct Reynolds complains of does not meet the standard for proving a hostile environment sexual harassment claim, she necessarily cannot prove that a reasonable person would have found her working conditions to be so intolerable that her resignation was compelled. The defendant's motion for summary judgment on Reynolds's claim for constructive discharge is therefore due to be granted.

### D.      Equal Pay Act

The Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), prohibits all gender-based wage discrimination in employment. To establish a *prima facie* case under the EPA, Reynolds must demonstrate that ACS paid a different wage to a male comparator than it did to her for equal work on a job, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *Meeks v. Computer Assoc. Int'l.*, 15 F.3d 1013, 1017 (11th Cir. 1994) (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992).

If Reynolds establishes a prima facie case, the burden then shifts to ACS to demonstrate that the differential was justified under one of the four affirmative defenses found in 29 U.S.C. § 206(d)(1), including, in pertinent part, that the pay differential was "based on any factor other than sex." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir.), *cert. denied*, 513 U.S.

38

919, 115 S. Ct. 298, 130 L. Ed. 2d 212 (1994). The burden is a "heavy one," *Mulhall*, 19 F.3d at

590, because the "defendant[] must show that the factor of sex provided no basis for the wage

differential." *Id*. If ACS meets its burden, Reynolds must then rebut the explanation for the

differential by showing with affirmative evidence that it is pretextual or offered as a post-event

justification. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).

Reynolds claims that ACS violated the EPA when it hired DeFranco at a higher salary

than she received. ACS does not dispute that DeFranco was hired at a higher salary than

Reynolds received, but argues that Reynolds resigned before DeFranco began working and before

it could act on Townley's suggestion that her pay be raised in equity with that of DeFranco once

he came on board. (Doc 21, Ex. 1 at ¶ 10). ACS further argues that DeFranco was assigned

more duties than Reynolds had to perform at ACS, and that Reynolds therefore cannot make out

the prima facie case with respect to the equality of the work she and DeFranco performed. (Doc

23 at 13-14).

Reynolds responds that DeFranco was hired at a higher salary to do the same job she was

performing, but that she quit when he was hired, so he received responsibility for some of her

duties. She thus argues that ACS intended to violate the EPA at the time it hired DeFranco. Yet,

to state a cause of action under the EPA, Reynolds must show that she and DeFranco did equal

work on a job, the performance of which requires equal skill, effort, and responsibility, and

which are performed under similar working conditions. *Meeks*, 15 F.3d at 1017 (11th Cir. 1994).

Regardless of what DeFranco was initially hired to do, he was ultimately responsible for

performing more duties than was Reynolds. Thus, Reynolds cannot establish a prima facie case

under the EPA. The motion for summary judgment on Reynolds's EPA claim is therefore due to

be granted.

### E.    Retaliation

In addition to prohibiting employers from discriminating on the basis of race, Title VII

makes it unlawful:

> for an employer to discriminate against any of his employees or applicants for
> employment, ... because he has opposed any practice made an unlawful
> employment practice by this subchapter [of Title VII], or because he has made a
> charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. § 2000e-3(a).  In order to establish a prima facie case of retaliation, the plaintiff must

show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3)

there was a causal link between his protected activity and the adverse employment action. *Bass v.*

*Board of County Commissioners*, 2001 WL 765620, at *19 (11th Cir. July 9, 2001); *see also*

*Gupta*, 212 F.3d at 587; *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999);

*Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997).

In applying the *Bass* analysis here, the court notes that Vie can satisfy the first

requirement for establishing a prima facie claim of retaliation: she engaged in protected activity

by filing a Charge of Discrimination with the EEOC.   The Eleventh Circuit has defined the

second prong, an "adverse employment action," as follows:

> 'An adverse employment action is an ultimate employment decision, such as
> discharge or failure to hire, or other conduct that alters the employee's
> compensation, terms, conditions, or privileges of employment, deprives him or
> her of employment opportunities, or adversely affects his or her status as an
> employee.'

*Bass*, 2001 WL 765620 at *20  (quoting *Gupta*, 212 F.3d at 587).  "Whether an action is

sufficient to constitute an adverse employment action for purposes of a retaliation claim must be

determined on a case-by-case basis." *Gupta*, 212 F.3d at 586.

Vie alleges that she suffered several adverse employment actions, including the following: (1) the removal of her ability to give consequences (punishment to the residents) or decrease the level of the residents, (2) reprimands she received regarding her signing in/out, (3) inquiries she received regarding missing therapy notes, and (4) the defendant's failure to provide her with light duty work upon her return from an on-the-job injury. Because the reprimands and inquiries mentioned in (2) and (3) above did not result in any disciplinary action, Vie cannot be said to have suffered any adverse employment action. *See Bass*, 2001 WL 765620 at *20 (conduct falling short of "ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause' of Title VII,") (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)).

Neither can Vie's alleged loss of the ability to give consequences or decrease residents' level serve as an "adverse employment action" so as to assist Vie in establishing a prima facie case of Title VII retaliation. Vie's inability to give consequences to students did not alter her "compensation, terms, conditions, or privileges of employment" and therefore, does not "constitute an adverse action under Title VII." *Bass*, 2001 WL 765620, *20 (citing *Graham v. State Farm Mut. Inc. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999)). It does not meet that "'threshold level of substantiality . . . to be cognizable under the anti-retaliation clause' of Title VII." *Bass*, 2001 WL 765620 at *20 (quoting *Wideman*, 141 F.3d at 1456). Vie's job description does not include giving consequences to the students, (Doc. 26, Ex. 5 at Ex. 1), and resident "[l]evel system decrease requires agreement of three personnel and is the primary responsibility of the resident counselors." (Doc. 21, Ex. 2 at Ex. 9). The evidence regarding changes in Vie's

41

authority to issue consequences to students is insufficient to show that such changes constitute an adverse employment action which would support an actionable retaliation claim.

ACS's failure to provide Vie with light-duty work meets the second prong of the *Bass* analysis in that it alters the terms of her employment. This decision, therefore must be examined under the third prong of the *Bass* test, pursuant to which the court must determine whether there was a "causal link between [her] protected activity and the adverse employment action." *Bass*, 2001 WL 765620, *19. In order to establish a causal connection, Vie "must show that the decisionmakers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Bass*, 2001 WL 765620, * 20 (citing *Gupta*, 212 F.3d at 590). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Id.* (citing *Gupta*, 212 F.3d at 590).

The decision regarding Vie's light duty request occurred more that two months after Vie filed her EEOC Charge of Discrimination. Assuming this temporal proximity is sufficient to establish circumstantial evidence of a causal connection, and thus her prima facie case, the burden then shifts to ACS to produce a "legitimate, non-retaliatory reason for its actions." *Bass*, 2001 WL 765620, *22. ACS's articulated reason for its failure to accommodate Vie's light duty request is that the restrictions placed on Vie by her physician precluded Vie from performing the essential functions of her position. (Doc. 22 at 14). Vie's physician recommended that she be "restricted from the participation in physical activities with residents," and "under no circumstances" was Vie to "participate in the process or assistance of the restraining of juveniles." (Doc. 21, Ex. 2 at Ex. 1). Furthermore, Vie's physician wrote that, in his medical opinion, "that when Ms. Vie reaches MMI (maximum medical improvement) she will have a

42

permanent work restriction that will prevent her from the process of restraining resident juveniles." (*Id.*).

The "Position Summary" as explained in Vie's "Job Description" requires that "Recreational Therapy Assistant lead[] and participate[] in the planning, scheduling, and implementation of Recreational Activity, [and] conduct[] special programs." (Doc. 26, Ex. 5 at Ex. 1). Clearly, if Vie was restricted from participation in physical activities with the residents, she could not perform the essential functions of her job.

Vie argues that the legitimate, nondiscriminatory reason offered by ACS is a pretext for illegal retaliation. In support of this argument, she points out that, although ACS denied her light duty work as a recreational counselor, it provided light duty work on a temporary basis to residential counselors James Adams and Christopher Galloway, who at one time suffered injuries that rendered them unable to restrain residents. Yet Vie does not compare and contrast her own job responsibilities as a recreational counselor with those of residential counselors such as Adams and Galloway. Nor does she explain how the medical restrictions imposed on Adams and Galloway prevented them from performing their jobs to any significant extent, or to an extent equal to or greater than her own medical restrictions prevented her from doing her own job. In fact, Vie admitted that Adams could perform his job under his restriction and she specifically declined to testify that Galloway could not perform his regular duties under his restriction. (Doc. 21, Ex. 2 at 161-65). Even more important, Adams's and Galloway's restrictions are not properly comparable to Vie's because their restrictions were apparently temporary, whereas Vie was left with a significant permanent restriction. She has therefore failed to present adequate evidence upon which the court could base a finding of pretext.

43

Because ACS has offered a legitimate, non-discriminatory reason for its adverse employment action, and Vie has failed to provide adequate evidence that ACS's articulated reason is pretextual, defendant's motion for summary judgment with respect to Vie's claims for retaliation is due to be granted.

## V.   CONCLUSION

For the reasons set forth above, the Magistrate Judge court finds that the defendant's Motion to Strike (doc. 29) is due to be granted in part and denied in part and that the defendant's Motion for Summary Judgment (doc. 19) is due to be granted.  An appropriate order will be entered contemporaneously herewith.

DONE this 28th day of September, 2001.

**JOHN E. OTT**
United States Magistrate Judge

44